FILED

March 9 2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0263

DA 15-0263

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2016 MT 62

EARLE D. WICKLUND, CLAUDE L. TEISINGER,
and EDWARD J. STEVENS as Trustees of the
Teisinger Stevens Wicklund Royalty Trust,

Plaintiffs and Appellants,

v.

G'NELL SUNDHEIM, JERRY SUNDHEIM, JIMMY SUNDHEIM,
SHARON SUNDHEIM, JUDEAN SUNDHEIM,
PATRICIA SUNDHEIM, ORION SUNDHEIM,
ELMA SUNDHEIM, ROBERT E. SUNDHEIM,
DELORES FRISON, AUDREY SUNDHEIM
ESTATE, JEFF SUNDHEIM as Personal Representative
of Audrey Sundheim Estate, NANCY MARIE PAWLOWSKI,
LAURA ANN PAWLOWSKI, SCOTT E. SUNDHEIM,
JEFFRY J. SUNDHEIM, RHONDA CAYKO and
ERIC L. SUNDHEIM, individually, and all other heirs of
Ole Sundheim and Iver Sundheim,

Defendants and Appellees.

APPEAL FROM:    District Court of the Seventh Judicial District,
In and For the County of Richland, Cause No. DV 13-54
Honorable David Cybulski, Presiding Judge

COUNSEL OF RECORD:

For Appellants:

Donald L. Harris, Harris & Associates, PLLC, Billings, Montana

Michael E. Zimmerman, Attorney at Law, Sheridan, Wyoming

For Appellees:

Albert R. Batterman, Batterman Law Offices, P.C., Baker, Montana

Submitted on Briefs:  December 16, 2015

Decided:  March 9, 2016

Filed:

_____
Clerk

2

Justice Beth Baker delivered the Opinion of the Court.

¶1     Earle D. Wicklund, Claude L. Teisinger, and Edward J. Stevens[1] (collectively Teisingers) appeal the findings of fact, conclusions of law, and order of the Seventh Judicial District Court, Richland County, denying their claim for a 3/5ths royalty interest in oil, gas, and minerals located on several sections of land in Richland County and quieting title to the royalty interest in Appellees'[2] favor.  We address the following issues on appeal:

> *1.  Whether the District Court improperly admitted testimony from an English professor interpreting the language of the warranty deed's royalty interest reservation.*
>
> *2.  Whether the District Court erred by resolving the ambiguity in the 1953 Warranty Deed in favor of Sundheims.*
>
> *3.  Whether the District Court erroneously applied the doctrine of laches to deny Teisingers' claim to the 3/5ths royalty interest.*

¶2     We reverse and remand with instructions consistent with this opinion.

## PROCEDURAL AND FACTUAL BACKROUND

¶3     On March 26, 1953, Chester L. Teisinger and Jennie M. Teisinger conveyed several sections of real property in Richland County (the Property) to Ole Sundheim and

---

[1] Wicklund, Teisinger, and Stevens appeal as Trustees of the Teisinger Stevens Wicklund Royalty Trust.

[2] Appellees are G'Nell Sundheim, Jerry Sundheim, Jimmy Sundheim, Sharon Sundheim, Judean Sundheim, Patricia Sundheim, Orion Sundheim, Elma Sundheim, Robert E. Sundheim, Delores Frison, Audrey Sundheim Estate, Jeff Sundheim as Personal Representative of the Audrey Sundheim Estate, Nancy Marie Pawlowski, Laura Ann Pawlowski, Scott E. Sundheim, Jeffry J. Sundheim, Rhonda Cayko, and Eric L. Sundheim, individually, and all other heirs of Ole Sundheim and Iver Sundheim.  We refer to the Appellees collectively as Sundheims.

Iver Sundheim by a warranty deed (1953 Warranty Deed), which included the following reservation language:

> First parties reserve unto themselves three-fifths (3/5ths) of Land owners [sic] oil, gas and mineral royalties and three-fifths (3/5ths) of any and all delay rentals on present and existing oil and gas leases now of record against the lands herein described; the conveyance herein is made subject to such oil and gas leases and any and all assignments now of record.

Prior to the sale, Teisingers' predecessors granted an oil and gas lease to R.L. Hill (Hill Lease) on certain sections of the Property. The Hill Lease was released in 1958. Teisingers and Sundheims dispute whether the reservation of royalties in the 1953 Warranty Deed applies to all royalty interests in the deeded property or only to delay rentals on oil and gas leases existing at the time of conveyance. The parties did not memorialize the terms of their purchase and sale agreement except through the 1953 Warranty Deed, and there is no evidence as to which party drafted the deed. Ole Sundheim—the longest-living party to the 1953 Warranty Deed—died in 1998.

¶4      From 1953 until 2011 there were few additional leases for drilling or production on the Property. In 2011 and 2012, True Oil LLC, Brigham Oil & Gas, LLP, and Whiting Oil and Gas Corporation began exploration and drilling. In August 2012, Whiting Oil and Gas obtained a First Supplemental Drilling and Division Order Title Opinion from Sadler Law Firm, LLP. The examining attorney noted that "the reservation in the [1953 Warranty Deed] is arguably ambiguous," and recommended that Whiting Oil and Gas obtain either a stipulation from the parties and other interest owners that

4

Teisingers own a 3/5ths landowners royalty interest or a judicial determination as to the meaning and effect of the reservation.

¶5 In December 2012, based on the Sadler attorney's advice, Whiting Oil and Gas notified Teisingers that they would not receive payments for the 3/5ths royalty interest until they obtained a quiet title judgment or stipulation. Sundheims refused to stipulate to Teisingers' 3/5ths royalty interest, and Teisingers filed this quiet title action on May 17, 2013, to confirm their royalty interest.

¶6 The District Court denied cross-motions for summary judgment and conducted a two-day bench trial. At the conclusion of the trial, the District Court entered findings of fact, conclusions of law, and an order denying Teisingers' claim for a 3/5ths royalty interest. Teisingers appeal.

## STANDARDS OF REVIEW

¶7 We review for clear error the findings of fact of a district court sitting without a jury. *Moerman v. Prairie Rose Res., Inc.*, 2013 MT 241, ¶ 17, 371 Mont. 338, 308 P.3d 75. Findings are clearly erroneous if they are not supported by substantial evidence, if the court misapprehended the effect of the evidence, or if we are convinced by our review of the record that the district court made a mistake. *In re Estate of Quirin*, 2015 MT 132, ¶ 10, 379 Mont. 173, 348 P.3d 658. We review a district court's conclusions of law to determine whether the court's interpretation of the law is correct. *Moerman*, ¶ 17.

¶8 We review a district court's ruling on the admissibility of expert testimony for abuse of discretion. *Hastie v. Alpine Orthopedics & Sports Med.*, 2015 MT 346, ¶ 14,

5

382 Mont. 21, 363 P.3d 435. Although a trial court's evidentiary rulings are discretionary, the court is "bound by the Rules of Evidence," and we review de novo its interpretation and construction of a statute or rule. *Kluver v. PPL Mont., LLC*, 2012 MT 321, ¶ 19, 368 Mont. 101, 293 P.3d 817.

¶9 Laches is a doctrine of equity that may apply when a person is negligent in asserting a right. *Cole v. State ex rel. Brown*, 2002 MT 32, ¶ 24, 308 Mont. 265, 42 P.3d 760. In reviewing a district court's exercise of its equitable power, we review all questions of fact arising upon evidence presented in the record to determine if the court's findings are clearly erroneous. *LeMond v. Yellowstone Dev., LLC*, 2014 MT 181A, ¶ 22, 375 Mont. 402, 334 P.3d 366. We determine if the court's interpretation of the law is correct. *LeMond*, ¶ 22.

## DISCUSSION

¶10 *1. Whether the District Court improperly admitted testimony from an English professor interpreting the language of the warranty deed's royalty interest reservation.*

¶11 Sundheims presented expert testimony from Dr. Nick Plunkey, an English professor from Rocky Mountain College, who analyzed the language of the deed. The District Court allowed Dr. Plunkey to give an expert opinion about his interpretation of the meaning of the reservation language in the 1953 Warranty Deed. Applying principles of grammar and sentence construction, Dr. Plunkey opined that the reservation language was ambiguous. Dr. Plunkey admitted that no rule of grammar mandates a particular interpretation of the reservation language. Nonetheless, Dr. Plunkey employed rules of sentence construction to conclude that the context and construction of the royalty

6

reservation support interpretation in favor of Sundheims. Dr. Plunkey opined that the reservation should be resolved by applying the prepositional phrase "on present and existing oil and gas leases" to modify both royalties and delay rentals.

¶12 Pre-trial, Teisingers objected to Dr. Plunkey's testimony on the ground that his testimony was irrelevant and could not help the court determine the meaning that the parties intended for the reservation. At trial, Teisingers objected three more times on the same ground. The District Court overruled all of Teisingers' objections and adopted Dr. Plunkey's opinion.

¶13 On appeal, Teisingers argue that the court was required to apply statutory rules of construction to resolve the ambiguity and thus erred in admitting and adopting Dr. Plunkey's opinion about how the ambiguity should be resolved. Teisingers assert that Dr. Plunkey's grammatical expertise was appropriate only to confirm that the reservation was subject to two different interpretations. Teisingers argue that Dr. Plunkey's opinion was based on speculation with no basis in fact and on the mistaken assumption that both royalties and delay rentals are dependent upon existing oil and gas leases.

¶14 Sundheims contend that Dr. Plunkey was not required to have expertise in the oil and gas industry in order for him to interpret and form an opinion regarding the language of the deed. According to Sundheims, the District Court did not err in adopting Dr. Plunkey's interpretation because it was "reasonable" and because it "was the only expert interpretation of the contract language offered at trial."

7

¶15 Rules 702, 704, and 705 of the Montana Rules of Evidence govern the admissibility of expert testimony. M. R. Evid. 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." M. R. Evid. 704 allows a qualified expert to testify as to an ultimate issue of fact. Under M. R. Evid. 705, however, expert opinion that states a legal conclusion or applies the law to the facts is inadmissible. *Cartwright v. Scheels All Sports, Inc.*, 2013 MT 158, ¶ 43, 370 Mont. 369, 310 P.3d 1080 (citing *Perdue v. Gagnon Farms, Inc.*, 2003 MT 47, ¶ 28, 314 Mont. 303, 65 P.3d 570). Legal conclusions offered by an expert witness invade the province of the fact-finder, whose duty it is to apply the law as given to the facts in the case. *Perdue*, ¶ 28.

¶16 When interpreting the language of a deed, we apply rules of contract interpretation. *Whary v. Plum Creek L.P.*, 2014 MT 71, ¶ 10, 374 Mont. 266, 320 P.3d 973. Construction and interpretation of a contract present questions of law for the court to decide. *Whary*, ¶ 10 (citing *Mattson v. Mont. Power Co.*, 2009 MT 286, ¶ 18, 352 Mont. 212, 215 P.3d 675). When a contract is ambiguous, the court may consider extrinsic evidence of the parties' intent. *Mary J. Baker Revocable Trust v. Cenex Harvest States, Coops., Inc.*, 2007 MT 159, ¶ 55, 338 Mont. 41, 164 P.3d 851. In the absence of relevant extrinsic evidence, any ambiguity in a written contract is resolved by the court as

8

a matter of law. 11 Richard A. Lord, *Williston on Contracts* § 30:7, 124-27 (4th ed. 2012).

¶17 While Dr. Plunkey couched his opinion in terms of the parties' intent, he attempted to divine that intent by interpreting the deed's terms based on technical principles of sentence construction. Dr. Plunkey's testimony involved construing and interpreting the meaning of the royalty reservation's language. Such interpretation is a legal conclusion for the court. *Whary*, ¶ 10. The District Court seemed to have acknowledged as much by adopting Dr. Plunkey's analysis as a conclusion of law. Under M. R. Evid. 705, Dr. Plunkey's testimony was inadmissible. The District Court erred by allowing his opinion on the meaning of the deed's language.

¶18 *2. Whether the District Court erred by resolving the ambiguity in the 1953 Warranty Deed in favor of Sundheims.*

¶19 Section 70-1-513, MCA, provides that "[g]rants are to be interpreted in like manner with contracts in general, except so far as is otherwise provided in this part." Section 28-3-301, MCA, provides that "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible . . . ." Section 28-3-303, MCA. The language of a contract governs its interpretation if the language is clear and unambiguous. Section 28-3-401, MCA.

¶20 The District Court concluded that the royalty reservation in the 1953 Warranty Deed was ambiguous. An ambiguity exists when the language of the contract is

9

reasonably subject to two different interpretations. *Ophus v. Fitz*, 2000 MT 251, ¶ 23, 301 Mont. 447, 11 P.3d 1192. "An ambiguity's existence must be determined on an objective basis." *Richards v. JTL Group, Inc.*, 2009 MT 173, ¶ 26, 350 Mont. 516, 212 P.3d 264 (citation omitted). What the "parties reserve[d] unto themselves" in the 1953 Warranty Deed reasonably could be interpreted in two different ways:

1.  three-fifths (3/5ths) of landowners' oil, gas and mineral royalties; and
2.  three-fifths (3/5ths) of any and all delay rentals on present and existing oil and gas leases now of record against the lands herein described.

or

1.  three-fifths (3/5ths) of landowners' oil, gas and mineral royalties on present and existing oil and gas leases now of record against the lands herein described; and
2.  three-fifths (3/5ths) of any and all delay rentals on present and existing oil and gas leases now of record against the lands herein described.

Objectively, and without demarcating punctuation, the "existing leases" language could apply either to just the delay rental reservation or to both the delay rental and the 3/5ths royalty reservation. We agree with the District Court that the deed is ambigious.

¶21 Once it is determined that an ambiguity in a contract exists, the ambiguity is resolved by applying rules of construction, *Morning Star Enters. v. R.H. Grover, Inc.*, 247 Mont. 105, 111, 805 P.2d 553, 557 (1991), and by considering extrinsic evidence of the parties' intent, *Ophus*, ¶ 29.

¶22 The District Court found that extrinsic evidence relating to the parties' actions after 1953 was "of minimal relevance and not illustrative of the original intent of [Teisingers' predecessors or Sundheims' predecessors]." Relying on an oil and gas treatise, The Law of Oil and Gas Leases, 2nd Ed., Vol. 1, Ch. 6, Sec. 6.11, the court

10

concluded that "'the language of the deed is the language of the grantor'" and that the royalty reservation in the 1953 Warranty Deed should be "'construed in the light most favorable to the grantee.'" Because Sundheims' predecessors were grantees under the 1953 Warranty Deed, the court resolved the ambiguity in favor of Sundheims.

¶23    Teisingers argue that the District Court erred in relying on the oil and gas treatise. Because the District Court concluded that the parties' actions after 1953 did not serve as sufficient extrinsic evidence to clarify the parties' original intent, Teisingers argue that the court "had no evidentiary basis upon which to resolve the ambiguous royalty reservation in favor of the Sundheims." Therefore, they contend, the court should have resolved the ambiguity in favor of Teisingers in accordance with the rule of construction set forth in § 70-1-516, MCA.

¶24    Sundheims argue that we should not consider Teisingers' argument for application of § 70-1-516, MCA, because Teisingers never presented argument regarding rules of construction at trial. In any case, Sundheims assert that Teisingers misinterpret § 70-1-516, MCA. Sundheims claim that the § 70-1-516, MCA, "does **not** require that ambiguity in a reservation be presumptively interpreted in a grantor's favor," but "requires only that a grantor receive that to which she is entitled in a reservation." Sundheims argue that because the statute does not reference ambiguities, "[t]he Court should not insert into [the] statute that which does not exist." Sundheims further argue that because deeds are interpreted in the same manner as other contracts, the court was required to resolve the ambiguity "most strongly against the party who caused the

11

ambiguity to exist . . . the promisor is presumed to be that party." Based on § 28-3-206, MCA, Sundheims assert that the language of the 1953 Warranty Deed is "attributable" to Teisingers' predecessors, who "should not be rewarded for making an ambiguous promise."

¶25 Section 28-3-206, MCA, sets forth a general rule of construction for resolving uncertainties in contract language: "In cases of uncertainty . . . the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. The promisor is presumed to be that party." Under § 70-1-513, MCA, deeds are interpreted in the same manner as contracts "*except so far as is otherwise provided in this part*." (Emphasis added.) Section 70-1-516, MCA, provides a specific rule of construction for reservations in grants of real property: "[A] reservation in any grant and every grant by a public officer or body, as such, to a private party is to be interpreted in favor of the grantor."

¶26 We consider the applicability of § 70-1-516, MCA, notwithstanding Sundheims' argument. Generally, we do not address an issue raised for the first time on appeal or a party's change in legal theory. *State v. Montgomery*, 2010 MT 193, ¶ 11, 357 Mont. 348, 239 P.3d 929 (citations omitted). However, "we have permitted parties to bolster their preserved issues with additional legal authority or to make further arguments within the scope of the legal theory articulated to the trial court." *Montgomery*, ¶ 12. *See, e.g.*, *Becker v. Rosebud Operating Servs.*, 2008 MT 285, ¶ 18, 345 Mont. 368, 191 P.3d 435; *Whitehorn v. Whitehorn Farms, Inc.*, 2008 MT 361, ¶ 23, 346 Mont. 394, 195 P.3d 836.

12

In the District Court, Teisingers argued that the court should resolve the deed's ambiguity in their favor. While Teisingers did not cite § 70-1-516, MCA, the statute is additional authority that supports their legal theory. Teisingers' argument that the court applied inapposite authority is appropriate for consideration on appeal.

¶27 We agree with Teisingers that § 70-1-516, MCA, applies in this case. Teisingers' predecessors—as grantors—granted the Property to Sundheims' predecessors—as grantees—subject to a reservation. The District Court determined that the language of the reservation was ambiguous. When the court rejected the extrinsic evidence and looked to rules of construction instead, it overlooked a governing statutory rule of construction.

¶28 Sundheims' contention that § 28-3-206, MCA, should be applied is unpersuasive. Section 70-1-516, MCA, plainly provides otherwise. Section 70-1-513, MCA. This section has been part of the Montana Code since 1895. Section 1473, Civ. C. 1895. *See Henningsen v. Stromberg*, 124 Mont. 185, 192, 221 P.2d 438, 442 (1950) (quoting § 6852, RCM (1935)) ("A grant is to be interpreted in favor of the grantee, except that a reservation in any grant, and every grant by a public officer or body, as such, to a private party, is to be interpreted in favor of the grantor."); *McReynolds v. McReynolds*, 147 Mont. 476, 479, 414 P.2d 531, 533 (1966) (citing § 67-1518, RCM (1947)) ("Unless the grant is by a public officer or contains a reservation it is to be interpreted in favor of the grantee."). We have recognized consistently that the rule of construction for reservations in a grant is governed by this statute, whether the grantor is a public entity or a private

13

individual. *Missoula v. Mix*, 123 Mont. 365, 372, 214 P.2d 212, 215 (1950) (concluding that "[b]y statutory rule the language of a reservation in a grant is to be interpreted in favor of the grantor, which is a different rule from that which existed at common law and under many other state statutes"); *Van Hook v. Jennings*, 1999 MT 198, ¶ 12, 295 Mont. 409, 983 P.2d 995 ("Ambiguities in a reservation of rights in any grant of property are to be interpreted in favor of the grantor."); *Ferriter v. Bartmess*, 281 Mont. 100, 103, 931 P.2d 709, 711 (1997) ("While a grant of property is to be interpreted in favor of the grantee, any reservation is to be interpreted in favor of the grantor."); *Macpherson v. Smoyer*, 191 Mont. 53, 60, 622 P.2d 188, 192 (1980) ("Section 70-1-516, MCA, provides that a reservation out of the grant of properties is to be interpreted in favor of the grantor."). Therefore, the District Court should have interpreted the language of the reservation in favor of Teisingers pursuant to § 70-1-516, MCA.

¶29     We conclude further that the District Court erred by disregarding extrinsic evidence in construing the 1953 Warranty Deed. Such evidence is appropriate in ascertaining the parties' intent when a contract is ambiguous. Section 28-3-301, MCA. As described in the Restatement (Second) of Contracts § 202(5) (1981), "[w]herever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade." Our case law is consistent with this principle. *Ophus*, ¶ 29 (citations omitted) ("The practical interpretation of a contract, which the

14

parties placed upon by it their course of conduct, is entitled to great, if not controlling influence in ascertaining what they understood by its terms.").

¶30   Following the release of the Hill Lease in 1958, the next recorded oil and gas activity on the Property occurred when Bertha Sundheim granted an oil and gas lease on July 30, 1973.  Ole and Alvina L. Sundheim granted a similar lease on the same date. Both leases were extended to Clinton Oil Company in 1975.

¶31   In 1975, Teisingers' predecessors signed and recorded a Stipulation and Disclaimer stating that they "disclaim any interest in minerals in the [Property], other than the landowner's royalty reserved in [the] conveyance."  Shortly before the Stipulation and Disclaimer was recorded, Teisingers' predecessors, Sundheims' predecessors, and other interest owners signed a Communitization Agreement.  The Agreement provided that the signing parties were those who owned "royalty, overriding royalty, working interest, or operating rights under the oil and gas leases and lands subject to this agreement."  The purpose of the Agreement was for the parties "to communitize and pool their respective mineral interests in [certain portions of the Property] for the purpose of developing and producing communitized substances . . . ." The Agreement was recorded on July 9, 1975, in Richland County.  There is no evidence of production occurring under the 1973-1975 leases.

¶32   In 1976, Bertha Sundheim leased oil and gas interests on a different portion of the Property.  In 1981, a producing well named the Four-Mile Creek 1-17 Well was developed on that portion.  During the first two months of production, Sundheims'

15

predecessors received all royalty payments from the well. Thereafter, Murphy Oil Corporation addressed Oil Division Orders regarding the Four-Mile Creek 1-17 Well to three of Teisingers' predecessors—Kendall Teisinger, Arlene E. Stevens, and Dorcas L. Wicklund. Teisingers' predecessors executed the Orders and returned them to Murphy Oil Corporation.

¶33    The Oil Division Orders credited each of the three Teisinger predecessors with 1/5th of 8/8ths of the royalty proceeds for a total of 3/5ths of 8/8ths of the royalty proceeds. Murphy Oil Corporation issued royalty payments to Teisingers' predecessors based on that fractional interest. Teisingers produced evidence at trial that Arlene E. Stevens received a total of $21,980.57 in seventeen separate royalty interest payments based on a 3/5ths interest from August 1982 until February 1985. Shortly thereafter, production stopped on the Four-Mile Creek 1-17 Well. Sundheims' predecessors received royalty payments based on a 2/5ths interest during the same time period. Sundheims' predecessors did not object to their fraction of the royalty interest after Murphy Oil changed the payment allocation.

¶34    Following abandonment of the Four-Mile Creek 1-17 Well, no oil or natural gas operator explored, by drilling, any lands on the Property until 2011 when preliminary drilling work began on several wells, giving rise to the instant litigation.

¶35    The District Court found this evidence of little value, concluding that Sundheims did not have actual notice of the Stipulation and Disclaimer and that the Teisinger family was not listed in the Communitization Agreement as the owner of any specific, particular

16

interest. In regard to the 1980s royalty payments, the court found that there was no evidence showing that Sundheims' predecessors were notified or aware of payments being received by Teisingers' predecessors, and concluded that Teisingers' assertions concerning what Sundheims' predecessors "knew or should have known from the contents of a Division Order is pure speculation."

¶36 We conclude that the District Court clearly erred in its findings regarding extrinsic evidence of the parties' intent. In signing the Communitization Agreement, Sundheims' predecessors voluntarily acknowledged Teisingers' mineral interest in the Property nearly two decades after the Hill Lease terminated in 1958. The Communitization Agreement is relevant to rebut Sundheims' argument that their predecessors believed that Teisingers' royalty interest expired with the Hill Lease in 1958. Subsequent to that Agreement, Teisingers' predecessors received royalty payments based on a 3/5ths fractional interest and Sundheims' predecessors received royalty payments based on a 2/5ths fractional interest for approximately two-and-a-half years. Sundheims' predecessors, including Ole Sundheim—an original party to the 1953 Warranty Deed—never objected to the fractional royalty payments.

¶37 "Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." Restatement (Second) of Contracts § 202(4). The parties' conduct supports Teisingers' contention that the 3/5ths

17

landowner's royalty reserved in the 1953 Warranty Deed did not expire with termination of the Hill Lease. Following the 1982-1985 royalty payments, there was no other significant mineral development on the Property until the activity that spawned this action.

¶38 In summary, the evidence regarding the parties' Communitization Agreement, their divided receipt of the Four-Mile Creek 1-17 Well royalty payments, and the Murphy Oil Division Orders, when construed under the principle set forth in § 70-1-516, MCA, supports construing the reservation language in favor of Teisingers. We conclude that the District Court erred in resolving the ambiguity in favor of Sundheims.

¶39 *3. Whether the District Court erroneously applied the doctrine of laches to deny Teisingers' claim to the 3/5ths royalty interest.*

¶40 Laches is an equitable remedy and applies only if the court finds "lack of diligence by the party against whom the defense is asserted *and* prejudice to the party asserting the defense." *Anderson v. Stokes*, 2007 MT 166, ¶ 19, 338 Mont. 118, 163 P.3d 1273 (emphasis in original) (citing *In re Marriage of Deist*, 2003 MT 263, ¶ 17, 317 Mont. 427, 77 P.3d 525; *Gue v. Olds*, 245 Mont. 117, 120, 799 P.2d 543, 545 (1990)). "Laches is not simply a matter of elapsed time; it is also the question of the inequity of permitting a claim to be enforced." *Anderson*, ¶ 19. Laches is an affirmative defense. M. R. Civ. P. 8(c)(1). Therefore, the party asserting the defense bears the burden of proof. *Dollar Plus Stores, Inc. v. R-Mont. Assocs., L.P.*, 2009 MT 164, ¶ 32, 350 Mont. 476, 209 P.3d 216.

¶41 The District Court primarily relied on *Hunter v. Rosebud County*, 240 Mont. 194, 783 P.2d 927 (1989), to support its conclusion that Teisingers' claim is barred by the

18

doctrine of laches. In *Hunter,* we identified eight specific factors that may be considered in determining laches. *Hunter,* 240 Mont. at 199-201, 783 P.2d at 930-31. The District Court relied on three of the *Hunter* factors to reach its conclusion: 1) the length of time that the present owners have used and occupied the land; 2) the length of time during which the plaintiffs and their predecessors abandoned the property and have not claimed any right; and 3) whether the property interest claimed has become extremely valuable. The court found in favor of Sundheims on each factor and determined the following: that Sundheims have used and occupied the land for 62 years; that Teisingers did not claim any interest in the property for 22 years and then "failed to resolve questions of title to royalties for an additional 40 years thereafter" by failing to timely probate the estate of C.L. and Jennie Teisinger; and that the Property is "now subject to significant oil production netting thousands of dollars in royalty payments each year." The District Court concluded that Teisingers' alleged delay in bringing this action "so prejudiced [Sundheims'] preparation of their case as to be inequitable" because Sundheims lost any opportunity to document their ancestors' position regarding the meaning of the royalty reservation or otherwise prepare to defend their ownership.

¶42 Teisingers argue that *Hunter* is distinguishable because in this case the District Court analyzed only three of the eight factors. Even then, Teisingers contend that the court erred by concluding that Teisingers had failed to claim or enforce their royalty interest for over 60 years. Teisingers point out that there was no justiciable issue giving rise to a quiet title action until late 2012 when Sundheims challenged Teisingers' royalty

19

interest. Moreover, Teisingers argue that the record demonstrates that each time there was oil and gas activity on the Property they consistently asserted their royalty interest. Teisingers emphasize that since 1953 there were only three instances where significant oil and gas activity occurred on the property: between 1973 and 1975, between 1981 and 1985, and from 2011 to the present. Teisingers point out that they signed both the Stipulation and Disclaimer and Communitization Agreement in 1975, that they were paid 3/5ths royalty interest without any objection from Sundheims from 1982-1985, and that they filed this quiet title action in early 2013 when they first learned that Sundheims objected to Teisingers' royalty interest ownership.

¶43    We conclude that the District Court erred in applying the doctrine of laches to bar Teisingers' claim. The court's finding that Teisingers failed to timely assert their royalty interest ownership claim is not supported by substantial evidence. The evidence demonstrates that Teisingers asserted their royalty interest each time there was or was about to be oil or gas development on the Property. Sundheims did not object to Teisingers' royalty interest until late 2012 when they received the letter from Whiting Oil and Gas. Shortly thereafter, Teisingers filed this quiet title action.

¶44    Furthermore, Sundheims have not established that any delay caused them prejudice. In *Anderson*, we upheld a district court's rejection of the defendant's laches defense because the defendant focused solely on the question whether the plaintiffs unreasonably delayed asserting their claims and ignored the question whether he had been prejudiced by the alleged delay. *Anderson*, ¶¶ 20-21. Like in *Anderson*, both the

20

District Court and Sundheims focused primarily on the length of time between the 1953 Warranty Deed and this action. Sundheims' only claim of prejudice was that, due to the alleged delay, they had no notice of Teisingers' royalty interest and therefore did not document their ancestors' position regarding the meaning of the royalty reservation. Sundheims' claim is unpersuasive. As discussed already, the record shows that based on Teisingers' conduct, Sundheims' ancestors were aware or should have been aware of Teisingers' claimed royalty interest prior to this action and did not object to it. Ole Sundheim lived until 1998—well after Teisingers had asserted their interest at least two times—and never objected to Teisingers' conduct. Therefore, the fact that Sundheims failed to document their ancestors' position was not due to any alleged delay by Teisingers. Without evidence to support the required showing of prejudice to Sundheims, it was inequitable for the court to apply the doctrine of laches to bar Teisingers' claim.

## CONCLUSION

¶45     We reverse the District Court's order granting judgment to Sundheims and remand for entry of judgment quieting title to the 3/5ths royalty interest reserved in the 1953 Warranty Deed in favor of Teisingers.


                                        /S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ JIM RICE

21

Justice Laurie McKinnon, dissenting.

¶46 I dissent from the Court's decision for a number of reasons. First, the Court applies a statute, § 70-1-516, MCA, which was never raised by the parties at trial or considered by the District Court. The Court departs from our well-recognized rule that we will not consider an issue raised for the first time on appeal, reasoning that the Teisingers argued "the court should resolve the deed's ambiguity in their favor" and that the "statute is additional authority that supports their legal theory." Opinion, ¶ 26. This begs the question of when an argument or issue that supports a party's position would ever be considered unpreserved for appellate review. In cherry picking what arguments we deem to be raised—based perhaps upon the outcome we would like to reach—we fail to provide appropriate guidance to litigants regarding what issues may be raised on appeal and inevitably invite a multitude of unpreserved claims. Here, in particular, the decisive factor in the Court's analysis is the presumption contained in § 70-1-516, MCA—an issue never raised or considered by the District Court.

¶47 Second, the rule that we will not consider issues raised for the first time on appeal exists for good reason. Primarily, it assures that through the adversarial process, all arguments and contingencies are raised and considered before this Court establishes a new rule of law or binding precedent. Simply put, it ensures accuracy of the decision making process, as well as its integrity. Here, we have held that § 70-1-516, MCA, is a legislative directive to interpret language of a reservation in a grant in favor of the grantor. Although we state the statute "plainly" requires such an interpretation, it is my

22

opinion that we have failed to observe a distinction made by the statute between a public grant and one that is between private parties.

¶48    "A grant is to be interpreted in favor of the grantee, *except that a reservation in any grant and every grant by a public officer or body, as such, to a private party is to be interpreted in favor of the grantor*." Section 70-1-516, MCA (emphasis added). The Court has seized upon the language of the statute's exception to apply a presumption contrary to the general rule requiring interpretation in favor of the grantee. However, "[a]ccording to the general rule a public grant is to be interpreted in favor of the grantor, whereas one between private parties is to be interpreted in favor of the grantee." *U.S. v. Eldredge*, 33 F. Supp. 337 (D. Mont. 1940); citing § 6852, RCM (1935). Deeds that convey mineral interests are subject to general rules governing contract interpretation, including the rule that "the deed will be construed against the grantor rather than against the grantee, because the grantor selects his or her own words." 53 Am. Jur. 2d *Mines and Minerals* § 185 (2016); *see also* § 28-3-206, MCA. However, "[b]y statute or rule of public policy, grants of property, including mineral interests, by the state may be required to be construed in favor of the state as grantor." 53 Am. Jur. 2d *Mines and Minerals* § 185 (2016); *see also Schwarz v. State*, 703 S.W.2d 187, 29 Tex. Sup. J. 145 (Tex. 1986) (distinguishing between a conveyance between private parties and one where the State of Texas is the grantor; the latter providing an example of the exception to the rule that the reservation is to be construed in favor of the grantee). Thus, far from being plain, the

Court embarks on territory heretofore never precisely addressed in our precedent and which has not been raised or considered by the trial court.

¶49 The Court relies upon *Missoula v. Mix* for the rule that the "language of a reservation in a grant is to be interpreted in favor of the grantor, *which is a different rule from that which existed at common law and under many other state statutes*." Opinion, ¶ 28 (emphasis added). This language recognizes a distinction and was applied in the context of the grantor, in fact, being a public body—the City of Missoula. A political body was also the grantor in *Mineral Cnty. v. Hyde*, 111 Mont. 535, 111 P.2d 284 (1941), which was relied upon by the Court in *Missoula v. Mix*. We simply have never addressed the interpretation of the exception found in § 70-1-516, MCA, as it relates to a reservation between private parties. Accordingly, I would not reach the conclusion the Court has respecting § 70-1-516, MCA, given that it was neither raised nor argued at trial.

¶50 Regardless of whether a statutory presumption was appropriately applied, it is my opinion that the District Court, given the ambiguity of the reservation, correctly weighed and considered the extrinsic evidence in finding that the reservation was limited to then-existing oil and gas leases. The Teisingers claim entitlement to royalties based upon: (1) their heirs' interpretation of two documents recorded in 1975; and (2) the payment pursuant to a title opinion of royalties to the heirs between 1976 and 1985.

¶51 The first document recorded in 1975 is entitled "Stipulation and Disclaimer" and was authored by the Teisinger themselves. The document claimed that the Teisingers had

24

a continuing royalty interest. There was no evidence, either through testimony or service of the document, that the Sundheims were aware of the document. The District Court properly afforded the "Stipulation and Disclaimer" little weight because of its inherently self-serving nature. The second document was a "Communitization Agreement," which allowed development of the minerals on the property. The District Court found that that agreement reflects typical oil industry practice to obtain signatures from every person who conceivably has an interest in the minerals when development occurs. The document reflects that the Sundheims held an interest in the minerals; however, it does not identify any specific mineral or royalty interest owned by the Teisingers. The District Court similarly attributed little weight to this document.

¶52 Finally, royalty payments made to the Teisingers between 1976 and 1985 were based upon a title report subsequently determined to be in error by two title attorneys and the District Court. There was no evidence, as noted by the District Court, that the royalty payments were proper or that the Sundheims were aware of them. Our analysis circuitously adopts the title report, regardless of whether it was correct, without any basis in law.

¶53 Grants of real property should generally be interpreted in the same manner as contracts. Section 70-1-513, MCA. "A contract must be so interpreted as to give effect to the mutual intention of the parties *as it existed at the time of contracting . . . .*" Section 28-3-301, MCA (emphasis added). The Teisingers failed to present any evidence of the parties' intentions at the time the 1953 Warranty Deed was executed. Their claim rests

25

solely on self-serving actions and upon the payment of royalties, which there is no evidence the Sundheims were aware of.

¶54 Finally, and importantly, the District Court recognized that the unusual size of the reservation—a 3/5ths interest—counseled against finding that it continued beyond 1958. Moreover, the size of the royalty payment was identical to the portion of delay rentals and both were contained within a single sentence of the 1953 Warranty Deed. The context and practice of the oil industry and the construction of the royalty reservation supports the conclusion that the royalty payment was to terminate in 1958 upon termination of the lease related to the delay rentals.

¶55 In my opinion, the District Court's factual findings were supported by substantial evidence and the court did not misapprehend the effect of the evidence. The Court has failed to indicate how the District Court's findings were clearly erroneous and not supported by substantial evidence. While we may disagree with the weight to be given to the testimony of witnesses and evidence, these matters are left to the district court's discretion. *In re Marriage of Kovarik*, 287 Mont. 350, 954 P.2d 1147 (1998). Finally, our decision rests squarely on the "principle set forth in § 70-1-516, MCA," Opinion, ¶ 38, which, in my view, is inappropriate to address. To the extent that we have supplanted our judgment for that of the District Court, ignored that the District Court relied on substantial evidence, and entertained an argument raised for the first time on appeal, I dissent.

/S/ LAURIE McKINNON